406 P.2d 113

Frank MILBERT, Plaintiff-Appellant,

v.

CARL CARBON, INC., Defendant-Respondent.

No. 9525.

Supreme Court of Idaho.

Sept. 30, 1965.

J. H. Felton, Lewiston, for appellant.

Clements & Clements, Lewiston, and Cashatt, Williams, Connelly & Rekofke, Spokane, Wash., for respondent.

SMITH, Justice.

Appellant brought this action for recovery of damages to real property allegedly caused by respondent's blasting operations, and by his alleged diversion of the waters of Palouse River; also to compel respondent to clear the stream bed of the river, and to

enjoin respondent from further blasting operations and further encroachment upon Palouse River in the vicinity of appellant's property. Respondent denied the allegations of appellant's complaint. The trial court denied any relief to appellant and entered judgment of dismissal of the action with prejudice. This appeal resulted.

The parcels of real property owned by the parties are located in Latah County, some two and one-half miles southwest of Potlatch. The parcels are in the vicinity where Palouse River is crossed by U. S. Highway 95, extending in a north-south direction.

Appellant's land, on the north and west, is bordered by Palouse River, and on the east by the Highway. Respondent's land is situate directly across the river from appellant's property. The river flows in a northwesterly direction between the two properties.

Appellant acquired his land in 1950; thereafter he constructed thereon a motel of 4 units and facilities for mobile homes, situate about 250 feet from the northwest bank of the river.

Each spring until 1958 the flood waters of the river inundated portions of the land. During flood stage the water came within 50 feet of the motel. During 1958, in order to control the flood condition, appellant constructed a dike 3 to 4 feet in height, located 30 to 40 feet from the edge of the northwest bank of the river at low water. Those events occurred prior to the time of respondent's activities which, appellant contends, resulted in diversion of the waters of the river onto his property.

The river reached flood level in 1959 and again in 1960 but the dike which appellant had constructed prevented flooding of his property. In the spring of 1961 the run-off of the river was unusually high and the flood waters inundated portions of appellant's land; this occurred prior to any work performed by respondent. When the river receded appellant constructed a second and larger dike on his land; that dike protected his property from the flood conditions that continued in 1962 and 1963.

Carl Carbon (later incorporated as respondent) purchased the Carbon property in December 1957, from one Howard Miller, who had previously operated a sawmill on the land. Carbon acquired the property for use as a quarry site to supply crushed rock in operation with respondent's asphalt paving business located on the southwesterly bank of Palouse River, and directly across the channel from appellant's property.

The sawmill and its log pond, prior to their removal in 1959, were located in an area lower than the surrounding terrain. In May 1959 respondent stripped top soil from a hill on its property and used the soil to fill in and level the site formerly occupied by the sawmill and the pond. Respondent

also leveled a narrow road which the predecessor Miller had constructed for transporting logs to and lumber from the sawmill. Respondent surfaced the road with crushed rock to remedy muddy conditions during the wet seasons. Respondent also stored some of the stripped soil on the southern portion of its land. The evidence is conflicting as to whether it caused some of the soil to be pushed into the river channel.

During the fall of 1959 respondent crushed rock for approximately two months, terminating the operation during November. Respondent did not renew the crushing operation until November 1961 when it operated for about one month. Its later crushing operations were for a week during June 1962 and about three weeks during April 1963.

Aerial photographs of the area taken before and after respondent had filled and leveled low areas on its property were admitted in evidence. Photographs and enlargements made from them were interpreted by an aerial and commercial photographer with 17 years experience. A comparison of the exhibits demonstrated no material change in the river in that area had occurred between August 1958, the time the first photograph was taken, and February 8, 1964, the time the last photograph was taken. Topographical points of reference, such as rocks, trees, and points of land, showed that the course of the river was identical in the two aerial photographs.

Appellant's complaint as regards respondent's blasting operations grew out of an incident which occurred April 18, 1963. At that time respondent's independent contractor was quarrying a supply of rock by use of explosives. One blast, on April 18th, caused broken rocks up to 30 pounds to be hurled upon appellant's property and the surrounding area, causing damage to appellant's property and mobile homes located on the premises. Appellant submitted a statement of damages which the contractor paid in full.

Appellant testified that his property was reduced in value from some $40,000.00 or $50,000.00 to $26,000.00 or $30,000.00, in consequence of respondent's operations at the rock pit.

On cross-examination appellant admitted that minor portions of his property had flooded each year. He testified that he built a dike in 1958 which averaged three to four feet in height, which prevented flood water from damaging his property in 1959 and 1960. He admitted that respondent's 1959 work did not cause the river to flood his, appellant's, diked property in 1960. Appellant also testified that his property was flooded during the spring of 1961, although respondent did no work on his property in 1960. His complaint deals primarily with work respondent performed

in November 1961, after the 1961 flood occurred. He admitted that the run-off of water during the spring of that year was more than the run-off of previous years. He testified that after he was flooded in the spring of 1961, he constructed another dike which averaged six feet higher than the one he had constructed during 1958. He has not been flooded since the construction of the new dike.

Appellant's testimony indicated that the only time he could have been flooded as a result of respondent's endeavors was during the spring of 1961. However, the evidence shows that the run-off during that year was of considerably greater volume than usual, which caused higher flood waters during the spring of that year.

Mr. Mygaard, called by appellant, had farmed the land adjacent to appellant's property to the west. He testified that Carl Carbon changed the river bed from 25 to 75 feet in different places, which forced the river to curve, cutting across a corner of appellant's property. He testified that flooding was worse in 1961 and 1962 than in previous years.

Two of appellant's witnesses then testified concerning respondent's blasting operations on April 18, 1963, which tossed rocks onto appellant's property, causing damage to trailer houses. They admitted the damage had been paid. They did not testify as to any other similar incident.

James Anderson, respondent's employée who supervised the rock operations and sold rock for respondent, testified that he had lived his entire life in the Potlatch area. He was familiar with the properties of both parties to the action, and with Palouse River in that area. The river had flooded every year. To his knowledge no material had been placed in the river and he had not observed the channel being diverted in any way. He stated that the appearance of the location looked about the same at the time of the trial (March 1964) as it did in 1959, except some of respondent's land had been stripped and some raised.

Carl Carbon testified that none of respondent's work performed had the effect of diverting the channel of the river. He stated that a low portion of the property, formerly the site of the sawmill, had been filled to prevent flooding. He testified to the times when crushing operations were conducted on the property, viz., September 2 to November 15, 1959; November 7 to December 14, 1961; June 13 to June 20, 1962, and April 12 to May 1, 1963.

Mr. Woolverton, called by respondent, had lived in the area many years. He testified that the run-off of 1961 was higher than during the years of 1960, 1962, or 1963. He also testified that when logs were stored in the log pond at the sawmill water was pumped into the pond. At flood stage, however, the river would flow

over the pond, although normal high water would not cover the pond.

Appellant, when recalled as a witness, marked lines on the aerial photographs to show where water would flow during extremely high water conditions, both before and after his diking operations, and the filling of low portions of respondent's property. He admitted that ordinary high water would not cover the area which he outlined.

The trial court, in its findings, described respondent's stripping and leveling operations on its property. The court then found:

"In leveling its property and building up low spots, defendant pushed no rock or other material into the stream bed. The stream bed of the Palouse River was in no way narrowed by the activities of the defendant in leveling off and building up said area. The building up and leveling off of said area increased the height of the bank of the defendant's property and has had the effect of confining the Palouse River to its natural channel during the flood stage. The activities of defendant have in no way encroached upon the Palouse River or in any way diverted the natural flow of the Palouse River toward and onto plaintiff's property. The activities of the defendant have in no way damaged the Palouse River or the property of the plaintiff."

The court further found that in 1961 the flood water stage of Palouse River was higher than in previous years which was due to a considerably larger or higher run-off of snow and rain, and not the result of any activities of respondent; that appellant had constructed the dikes, and that although the river flooded in 1962 and 1963, appellant's property was not flooded during those years.

The court found, as regards the blasting and resulting damages, that on April 18, 1963, rocks were hurled across the river onto appellant's property, caused by the blasting operations of respondent's independent contractor; and then found:

"No damages were sustained by the plaintiff, but there was some damage sustained to the property belonging to the plaintiff's tenants. All of said damage has been taken care of and the plaintiff's tenants have been compensated for the same."

The court also found that on no other occasion had respondent, or its agents, caused any rocks or debris to be cast upon appellant's property by reason of blasting operations.

The court concluded that appellant was not entitled to injunctive relief nor to damages, and thereupon by its judgment, dismissed the action with prejudice.

**478**

It is to the foregoing referred to findings that appellant has directed assignments of error grounded upon his asserted insufficiency of the evidence to support the same.

Appellant seeks to apply herein the proposition that a person cannot by a dam, embankment or other artificial means, obstruct the natural flow of water in a stream, and throw it back on the lands of another, without being liable for the resulting damages, unless he has an easement or right upon or in such lands to do so. Chandler v. Drainage Dist. No. 2, 68 Idaho 42, 187 P.2d 971 (1947); also that one who undertakes to change the course of a natural stream is under the duty of making any change in the natural channel of sufficient capacity and quality as to accommodate not only the normal flow, but also such high waters as may reasonably be anticipated from heavy and protracted rains not amounting to a vis major, and·which the old channel was capable of carrying away without damage to neighboring property. Harper v. Johannesen, 84 Idaho 278, 371 P.2d 842 (1962).

■ Flood waters are waters which escape, because of their height, from the confinement of a stream and overflow adjoining territory; implicit in the definition is the element of abnormality. Everett v. Davis, 18 Cal.2d 389, 115 P.2d 821 (1941); Costello v. Bowen, 80 Cal.App.2d 621, 182 P.2d 615 (1947); De Ruwe v. Morrison, 28 Wash.2d 797, 184 P.2d 273 (1947).

■ A riparian owner of land abutting upon a stream, whether navigable or non-navigable, has the right to place such barriers as will prevent his land from being overflowed or damaged by the stream, and for the purpose of keeping the same within its natural channel. A riparian owner, however, has no right to place obstruction into the stream for the purpose of changing the natural channel of the stream, or for any other purpose, that would do damage to the riparian owner on the opposite side or to owners of land abutting upon the stream either above or below. Boise Development Company v. Idaho Trust & Savings Bank, 24 Idaho 36, 133 P. 916 (1913); Fischer v. Davis, 19 Idaho 493, 116 P. 412 (1911).

■ The trial court's finding that respondent had not in fact diverted the natural course of Palouse River is based upon substantial, although conflicting, evidence; therefore the finding will not be disturbed upon appeal. Andrus v. Irick, 87 Idaho 471, 394 P.2d 304 (1964); Fish v. Fleishman, 87 Idaho 126, 391 P.2d 344 (1964); Thomson v. Marks, 86 Idaho 166, 384 P.2d 69 (1963).

Appellant asserts his entitlement to injunctive relief for the purpose of enjoining the blasting of rock onto his property,

based upon the premise that a trespass may be enjoined.

The evidence shows and the trial court found that only the one instance of respondent's blasting on April 18, 1963, caused damage to the property of appellant's tenants.

■■ Injunction to restrain trespass is ordinarily confined to cases where the nature of the property or frequent repetition of the trespass precludes recovery of remedial damages at law. In the case of injury to land, injunctive relief will not be granted where the plaintiff has an adequate remedy at law. 43 C.J.S. Injunctions §§ 57 and 60. See also Johnson v. Twin Falls Canal Co., 66 Idaho 660, 167 P.2d 834 (1946).

In Central Iron Coal & Gas Co. v. Vanderheurk, 147 Ala. 546, 41 So. 145, 6 L.R.A., N.S., 570 (1906), cited by appellant, the court found that defendant's blasting operations continuously and constantly cast debris upon plaintiff's premises. Even under those circumstances the injunction which issued prohibited the defendant from casting debris upon plaintiff's property, but not from blasting.

Appellant also cites 43 C.J.S. Injunctions § 70 in support of his assertion that injunction will lie to prevent blasting which throws debris upon the property of another. The text refers to East v. Saks, 214 Ala. 58, 106 So. 185 (1925). In that case the evidence disclosed continuous, repeated and daily showering of debris upon plaintiff's premises, occasioned by defendant's blasting operations.

■ The granting or refusing of injunctive relief rests in the sound discretion of the court. I.C. § 8–402; Unity Light & Power Co. v. City of Burley, 83 Idaho 285, 361 P.2d 788 (1961); White v. Coeur d'Alene Big Creek Mining Co., 56 Idaho 282, 55 P.2d 720 (1936); Rowland v. Kellogg Power & Water Co., 40 Idaho 216, 233 P. 869 (1925). The exercise of such discretion by the trial court in granting or refusing an injunction will not be reversed on appeal unless a clear abuse of discretion is shown. Unity Light & Power Co. v. City of Burley, supra.

■ The trial court was correct in refusing injunctive relief or damages to appellant.

The judgment of the trial court is affirmed. Costs to respondent.

McQUADE, C. J., and McFADDEN, TAYLOR and KNUDSON, JJ., concur.